**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) MUSCOGEE (CREEK) NATION, a federally recognized Indian tribe, | |
| *Plaintiff*, | |
| v. | Case No. 26-cv-00003-JFJ |
| (1) WADE FREE, in his official capacity as Director, Oklahoma Department of Wildlife Conservation, and | |
| (2) RUSSELL COCHRAN, in his official capacity as special prosecutor appointed by the Governor, | |
| *Defendants*. | |

**MOTION OF THE MUSCOGEE (CREEK) NATION FOR PRELIMINARY
INJUNCTION AND OPENING BRIEF IN SUPPORT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .....................................................................................................................1

BACKGROUND .......................................................................................................................3

I.     The Creek Reservation and the Nation's Right of Self-Government ...................................3

II.    The Nation's Comprehensive Conservation Code and Conservation Regulations.............4

III.   Defendants' Efforts To Regulate On-Reservation Hunting and Fishing and the
       Vigorous Denunciation of Those Efforts by Attorney General Drummond ......................7

ARGUMENT ..........................................................................................................................10

I.     The Nation Has a Substantial Likelihood of Prevailing on the Merits. ...........................11

       A.     The Nation Has Sovereign Authority To Regulate Hunting and Fishing by
              Its Citizens within Its Reservation Free from State Interference. ..........................11

       B.     No Exceptional Circumstances Warrant State Regulation of Creek Citizens
              on the Creek Reservation. .....................................................................................14

       C.     The ODWC's Asserted Legal Justification for Its New Policy Is Erroneous. .......15

II.    Defendants' Actions Irreparably Harm the Nation and Its Citizens...................................19

III.   The Balance of Harms and Public Interest Strongly Favor Injunctive Relief. ..................23

CONCLUSION........................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Alaska v. Native Village of Venetie Tribal Government*,
    522 U.S. 520 (1998) ............................................................................... 17

*Cherokee Nation v. Free*,
    No. 4:25-cv-00630-CVE-JFJ (N.D. Okla. Nov. 18, 2025) .................................... 2, 7

*Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma*,
    618 F.2d 665 (10th Cir. 1980) ........................................................... passim

*Department of Game of the Washington v. Puyallup Tribe*,
    414 U.S. 44 (1973) ............................................................................. 14

*Diné Citizens Against Ruining Our Environment v. Jewell*,
    839 F.3d 1276 (10th Cir. 2016) ............................................................. 10

*Dutcher v. Matheson*,
    840 F.3d 1183 (10th Cir. 2016) ............................................................. 16

*Fisher v. District Court of Sixteenth Judicial District*,
    424 U.S. 382 (1976) ....................................................................... 21, 23

*Hackford v. Utah*,
    845 F.3d 1325 (10th Cir. 2017) ........................................................... 12, 13

*Hooper v. City of Tulsa*,
    71 F.4th 1270 (10th Cir. 2023) ............................................................. 23

*Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Oklahoma Tax Commission*,
    829 F.2d 967 (10th Cir. 1987) ............................................................. 12

*McClanahan v. State Tax Commission of Arizona*,
    411 U.S. 164 (1973) ........................................................................... 3

*McGirt v. Oklahoma*,
    591 U.S. 894 (2020) ..................................................................... passim

*Muscogee (Creek) Nation v. City of Henryetta*,
    25-CV-227-JAR, 2025 WL 3215729 (E.D. Okla. Nov. 18, 2025) ......................... 16

*Navajo Nation v. Dalley*,
    896 F.3d 1196 (10th Cir. 2018) ............................................................. 21

*New Mexico v. Mescalero Apache Tribe*,
    462 U.S. 324 (1983) ..................................................................... passim

ii

*Oklahoma ex rel. Fent v. Oklahoma ex rel. Oklahoma Water Resources Board*,
    66 P.3d 432 (Okla. 2003)..................................................................... 10

*Oklahoma ex rel. York v. Turpen*,
    681 P.2d 763 (Okla. 1984).................................................................. 10

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022) ........................................................................ 18

*Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) ................................................... passim

*Puyallup Tribe, Inc. v. Department of Game of Washington*,
    433 U.S. 165 (1977)......................................................................... 14

*Ross v. Neff*,
    905 F.2d 1349 (10th Cir. 1990) ......................................................... 13

*Stroble v. Oklahoma Tax Commission*,
    No. 120,806, 2025 WL 1805918 (Okla. July 1, 2025)....................... 15, 17

*Timpanogos Tribe v. Conway*,
    286 F.3d 1195 (10th Cir. 2002) .........................................................11

*United States v. Dion*,
    476 U.S. 734 (1986) ........................................................................11

*United States v. Felter*,
    752 F.2d 1505 (10th Cir. 1985) ..................................................1, 11, 14

*United States v. Fox*,
    573 F.3d 1050 (10th Cir. 2009) .........................................................11

*United States v. Sands*,
    968 F.2d 1058 (10th Cir. 1992) ......................................................... 13

*United States v. Wheeler*,
    435 U.S. 313 (1978) ........................................................................ 17

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*,
    22 F.4th 892 (10th Cir. 2022) ............................................................. 3

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
    790 F.3d 1000 (10th Cir. 2015) ........................................... 2, 13, 21, 22

*Wilder v. Turner*,
    490 F.3d 810 (10th Cir. 2007) ......................................................... 16

*Wyandotte Nation v. Sebelius*,
　443 F.3d 1247 (10th Cir. 2006) ............................................................. 19

*Ysleta Del Sur Pueblo v. Texas*,
　596 U.S. 685 (2022) ............................................................................... 19

**Statutes and Constitutional Provisions**

18 U.S.C. § 1151 ............................................................... 15, 16, 17, 18

18 U.S.C. § 1153 (Major Crimes Act) ...................................................... 15

18 U.S.C. § 1162(b) ................................................................................. 12

25 U.S.C. § 232 ....................................................................................... 12

25 U.S.C. § 233 ....................................................................................... 12

25 U.S.C. § 1321(b) ................................................................................. 12

Okla. Stat. tit. 74, § 18b .................................................................... 10, 13

MCN Const. Preamble ............................................................................ 22

MCNCA tit. 23, ch. 2 (Conservation Code) ........................................ 5, 6, 7

**Treaties**

Treaty with the Creeks art. XIV, Mar. 24, 1832, 7 Stat. 366 ................... 16

Treaty with the Creeks preamble, Feb. 14, 1833, 7 Stat. 417 .................. 16

Treaty with Creeks and Seminoles art. XV, Aug. 7, 1856, 11 Stat. 699 ...... 16

**Regulations**

Okla. Admin. Code tit. 800, chs. 1, 10, 25 ............................................... 6

MCN Conservation Regulations ......................................................... 5, 6, 7

**Other Authorities**

Derrick James, *Stitt Reloads in Jurisdiction Fight, Appoints Special Prosecutor for Tribal
　Hunting Cases*, NonDoc (Nov. 15, 2025) ................................................. 9

Press Release, ODWC, ODWC Reaffirms Enforcement of Oklahoma's Wildlife Laws
　(Oct. 9, 2025) .......................................................................... 7, 15, 23

Press Release, Okla. Att'y Gen., Drummond To Dismiss Native American Hunting Case
    (Oct. 30, 2025) ...................................................................................................................9

Press Release, Oklahoma.gov, Governor Stitt Fights for Rule of Law, Wildlife Conservation
    (Nov. 21, 2025) ..................................................................................................................7

Supreme Court docket (*Stroble v. Oklahoma Tax Commission*, No. 25-382)................................16

# INTRODUCTION

The Muscogee (Creek) Nation ("Nation") moves for a preliminary injunction prohibiting Defendants Wade Free, Director of the Oklahoma Department of Wildlife Conservation (ODWC), and Russell Cochran, special state prosecutor for wildlife offenses (together, "Defendants"), from regulating and enforcing state law against Nation citizens hunting and fishing within the Creek Reservation in full compliance with the Nation's own fish and game regulations. By coercing Nation citizens to obtain state licenses for Nation-licensed hunting and fishing activities under threat of citation and state-court prosecution, Defendants' actions nullify the force of the Nation's own regulations and interfere with its jurisdiction over its citizens and territory. These actions violate the Nation's sovereignty and right of self-government, the treaty-protected hunting and fishing rights of Creek citizens and their own rights of self-government, and controlling precedents upholding the long-settled prohibition against state regulation of on-reservation hunting and fishing by tribal citizens.

The Nation has a strong likelihood of success on the merits. Under longstanding Supreme Court and Tenth Circuit precedent, a tribe's authority to regulate hunting and fishing by its citizens within its Indian country constitutes a key "aspect of tribal sovereignty," *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 337 (1983). Tribal hunting and fishing regulations therefore exist under "the protection of" and carry "the force of federal law," *id*. at 338, and absent the assent of Congress, where "land remains in Indian Country status, [tribal citizens] are not subject to state regulation" of their hunting and fishing activities, *United States v. Felter*, 752 F.2d 1505, 1510 (10th Cir. 1985); *see also Cheyenne-Arapaho Tribes of Okla. v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980) (holding that "state hunting and fishing laws do not apply, directly or indirectly, to hunting and fishing by [tribal] members" within a tribe's Indian country). As a corollary to this categorical rule, states may not criminally prosecute tribal

citizens for non-compliance with state hunting and fishing laws. *See McGirt v. Oklahoma*, 591 U.S. 894, 898, 929 (2020) (stating that states "generally have no jurisdiction to try Indians for conduct committed in Indian country" absent "a clear expression of the intention of Congress" (quotation marks and citation omitted)); *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1004 (10th Cir. 2015) (same).

Flouting these unequivocal mandates of federal law, Defendant Free announced in October 2025 that ODWC officials will, under his direction, enforce Oklahoma fish and game laws against all tribal citizens in Indian country in Oklahoma, which includes Creek citizens lawfully exercising their treaty-protected hunting and fishing rights within the boundaries of the Creek Reservation. Defendant Cochran has been appointed as a special prosecutor to criminally prosecute tribal citizens for non-compliance with state hunting and fishing regulations within Indian country in Oklahoma, and he has initiated such prosecutions for hunting and fishing activity taking place on adjacent reservations. *See* Complaint ¶¶ 96–104, *Cherokee Nation v. Free*, No. 4:25-cv-00630-CVE-JFJ (N.D. Okla. Nov. 18, 2025).

Pursuant to the ODWC's new policy, ODWC officials under the Direction of Defendant Free have threatened Nation citizens with citation and prosecution should they exercise their treaty-protected hunting and fishing rights within the Creek Reservation without a license from the ODWC and without reporting their harvest to the ODWC. Nation citizens have responded to that threat by complying with the ODWC's requirements in lieu of the Nation's to avoid being cited and prosecuted by Defendants. Defendants have undertaken their actions over the forceful objections of Oklahoma Attorney General Gentner Drummond, who has repeatedly informed Defendant Free that the ODWC's policy "directly contradicts well-established federal law recognizing tribal sovereignty over hunting and fishing by tribal members on reservation lands,"

Complaint Ex. 3 (Dkt. 1-3) at PDF p. 2, and that under controlling United States Supreme Court precedent, states have no "authority to regulate hunting and fishing by Indians on their own reservations," Complaint Ex. 4 (Dkt. 1-4) at 3 (citing *Mescalero*, 462 U.S. at 330).

The other requirements for a preliminary injunction are also readily satisfied here. The Tenth Circuit, in directly analogous cases, has repeatedly held that unauthorized assertions of state jurisdiction over tribal citizens within their own Indian country irreparably harm tribal sovereignty and self-government. That is the case here, as declarations from Nation officials and citizens confirm. Tenth Circuit precedent likewise establishes that the balance of harms and the public interest weigh decisively in favor of preliminarily enjoining unauthorized state assertions of jurisdiction over a tribe's citizens within its own Indian country.

**BACKGROUND**

## I.      The Creek Reservation and the Nation's Right of Self-Government

In *McGirt*, the Supreme Court confirmed that in treaties negotiated between 1832 and 1866, Congress established a federally protected reservation for the Nation, 591 U.S. at 899–902, within which "the Creeks were to be secured in the unrestricted right of self-government," *id*. at 902 (quotation marks omitted). The Creek Reservation remains Indian country today, *id*. at 902–913, and it is a well-established principle of federal Indian law that the Nation and its citizens enjoy immunity from state regulation on the Reservation unless Congress provides otherwise. *See, e.g.*, *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 170–71 (1973) ("State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply." (citation omitted)); *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 899–900 (10th Cir. 2022) (discussing the "longstanding federal policy … of leaving Indians free from state jurisdiction and control"

3

within Indian country "absent clear congressional authorization" (quotation marks and citation

omitted)). As the Supreme Court explained in *Mescalero Apache Tribe*, a case involving

"whether a State may restrict an Indian Tribe's regulation of hunting and fishing on its

reservation," 462 U.S. at 325, the rights of Indian nations to govern their citizens within their

reservations have "never been doubted, and ... absent governing Acts of Congress, a State may

not act in a manner that infringe[s] on the right of reservation Indians to make their own laws and

be ruled by them," *id.* at 332 (quotation marks omitted)).

## II.     The Nation's Comprehensive Conservation Code and Conservation Regulations

A substantial number of Creek citizens hunt and fish within the Nation's Reservation as a

central part of their way of life. They do so to provide a critical source of food throughout the

year and to sustain important cultural and family traditions. *See* Decl. of Sec'y of Interior Affs.

Trenton Kissee ¶¶ 17–24; Decl. of Jordan Pettigrew ¶¶ 9, 11–12; Decl. of Trey Downum ¶¶ 3–5,

7–8. The Nation accordingly has made resource conservation and the enhancement of hunting

and fishing opportunities a high governmental priority. For example, it has opened more than

10,000 acres of Nation-owned lands for hunting and fishing by Nation citizens, many of whom

would otherwise lack access to land or waters to hunt and fish. Kissee Decl. ¶ 18. The Nation's

Division of Agriculture and Natural Resources (DANR) operates a game processing facility and

a program through which Nation hunters can donate meat for elders and other needy members of

the community. *Id*. ¶ 19. The DANR also operates youth hunting and fishing programs to teach

traditional methods and conservation principles and to deepen the connections between young

Nation citizens and their culture and heritage; the DANR operates similar programs for Creek

citizens who are military veterans. *Id*. ¶¶ 21–24.

The DANR employs five full-time wildlife biologists and additional staff who engage in a range of conservation activities, including: research; data collection and analysis; critical habitat restoration and management; water quality testing and monitoring; and coordination and data-sharing with neighboring tribes, the federal government, and the ODWC. *Id*. ¶¶ 10, 13, 35, 39. The Nation's fish and wildlife conservation efforts have been nationally recognized as exemplary by tribal and non-tribal wildlife conservation organizations. *Id*. ¶ 15.

As a core aspect of its sovereign determination to preserve and enhance hunting and fishing opportunities within its Reservation, the Nation has enacted a comprehensive Conservation Code and the DANR has promulgated Conservation Regulations under it, which together govern on-reservation hunting and fishing. *See* Kissee Decl. ¶¶ 4–10; Decl. of Deputy Att'y Gen. Geraldine Wisner ¶¶ 5–9; MCNCA tit. 23, ch. 2 (Conservation Code);[1] MCN Conservation Regs.[2] It has done so because "[i]t is necessary for the good of the Nation that fish, wildlife, plants and other natural resources not be taken or depleted without the oversight and regulation of the Muscogee (Creek) Nation." 23 MCNCA § 2-102(B). The Code seeks to create "an orderly system for Tribal control and regulation of hunting, fishing, trapping, gathering and outdoor recreation [and] … a means of conservation, enhancement, protection and management of the Nation's fish, wildlife, and plant populations[.]" *Id*. § 2-103(A), (B); *see also* Kissee Decl. ¶ 4.

The Nation's Conservation Code and Conservation Regulations are enforced through its DANR, game rangers, peace officers, and tribal court system in cooperation with federal authorities. *See, e.g.*, Kissee Decl. ¶¶ 26–29; Wisner Decl. ¶¶ 5–11; 23 MCNCA §§ 2-201, 2-202,

---

[1] https://law.muscogeenation.com/mvskokelaw/title-23/title-23-chapter-2-conservation-code.
[2] https://www.muscogeenation.com/wp-content/uploads/2025/11/Final-25-26-Conservation-Regulations.pdf.

4-401–4-409; MCN Conservation Regs. §§ 5-42, 5-43. Under Nation law, a Creek citizenship card serves as a general hunting and fishing license, 23 MCNCA § 3-301, and every licensed Nation citizen must comply with comprehensive, species-specific restrictions regarding a host of issues, including permissible seasons, harvest and possession limits, harvest reporting requirements, gear restrictions, and hunter safety protocols and certification requirements, MCN Conservation Regs. chs. 1–3.

In substance, the Nation's fish and game regulations track those of the ODWC on a provision-by-provision basis. Thus, the Nation applies to its own citizens under Nation law restrictions equivalent to (or in some cases stricter than) those the ODWC applies to non-Indian hunters and fishers throughout the Creek Reservation and elsewhere in Oklahoma. *Compare id*., *with* Okla. Admin. Code tit. 800, chs. 1, 10, 25; Kissee Decl. ¶ 8. The Nation's provision-by-provision alignment of its fish and game regulations with those of the ODWC is not an accident—it is intended to ensure clarity and consistency in the regulation, harvest, and conservation of shared natural resources. *See id*. ¶¶ 7–8; Wisner Decl. ¶ 9.

To this end, the Nation also shares its harvest and meat safety inspection data with the ODWC to promote statewide sound management, public health, and conservation. Kissee Decl. ¶¶ 10, 14; it cooperates with the ODWC on fish habitat restoration projects, Kissee Decl. ¶ 13; and it is party to a Bureau of Indian Affairs (BIA) deputation agreement under which BIA, Nation, and ODWC game wardens are authorized to react immediately to observed violations of fish and game laws by Indians and non-Indians alike within the Creek Reservation and to refer the offender to the government with jurisdiction to prosecute. Wisner Decl. ¶¶ 12–15.

The Nation's Conservation Code and Conservation Regulations also include robust protections for private property rights. Kissee Decl. ¶¶ 4, 6. Nation citizens are prohibited from

hunting or fishing on private property without consent of the owner. 23 MCNCA § 3-303; MCN

Conservation Regs. § 3-41. And hunters must adhere to a detailed array of restrictions to ensure

public safety. *See, e.g.*, 23 MCNCA §§ 3-312, 3-313, 3-314, 3-315; Wisner Decl. ¶ 9.

If Nation citizens hunting and fishing within the Reservation comply with the foregoing

regulatory requirements and applicable federal law—*see, e.g.*, MCN Conservation Regs. § 1-

13(C) (requiring game-specific federal licenses in addition to Nation license)—their hunting and

fishing activities are lawful as a matter of Nation law. Wisner Decl. ¶ 5.

### III. Defendants' Efforts To Regulate On-Reservation Hunting and Fishing and the Vigorous Denunciation of Those Efforts by Attorney General Drummond

In the years following the *McGirt* decision, the Nation exclusively regulated the hunting

and fishing of its citizens throughout its Reservation without interference by the ODWC. *See*

Kissee Decl. ¶¶ 17, 29; Wisner Decl. ¶¶ 18–19. But Governor Stitt's Administration has evinced

ever-increasing hostility towards what the Governor refers to as "'the misguided *McGirt*

decision,'" and wildlife regulation has become the latest front in his attacks on that precedent.[3]

Thus, in early October 2025, Defendant Free issued an ODWC directive proclaiming that

"state fish and wildlife laws apply to everyone in Oklahoma regardless of race, heritage, or

background," and that the ODWC would impose criminal penalties on "anyone in violation of

the state's fish and game laws, regardless of tribal citizenship."[4] In the wake of this directive,

several non-Creek Indians were cited for hunting and fishing on other Reservations without a

state license. *See* Complaint ¶¶ 101–105, *Cherokee Nation v. Free*, No. 4:25-cv-00630-CVE-JFJ.

---

[3] Press Release, Oklahoma.gov, Governor Stitt Fights for Rule of Law, Wildlife Conservation (Nov. 21, 2025), https://oklahoma.gov/governor/newsroom/newsroom/2025/governor-stitt-fights-for-rule-of-law--wildlife-conservation.html.

[4] Press Release, ODWC, ODWC Reaffirms Enforcement of Oklahoma's Wildlife Laws (Oct. 9, 2025), https://www.wildlifedepartment.com/outdoor-news/odwc-reaffirms-enforcement-oklahomas-wildlife-laws.

The ODWC directive and ensuing prosecutions prompted a forceful rejection by
Oklahoma Attorney General Gentner Drummond. In early November 2025, Attorney General
Drummond informed Defendant Free that the ODWC's new policy "finds no support in
Oklahoma law," Complaint Ex. 2 (Dkt. 1-2) at 3, and "contradicts well-established federal law
recognizing tribal sovereignty over hunting and fishing by tribal members on reservation lands,"
Dkt. 1-3 at PDF p. 2. Attorney General Drummond further admonished Defendant Free that the
ODWC's enforcement actions

> are not merely ill-advised—they are unlawful. They expose individual ODWC
> officers to personal liability under 42 U.S.C. § 1983. They waste limited law
> enforcement and prosecutorial resources on cases that cannot succeed. And they
> inflict significant harm on the State's government-to-government relationships
> with the Five Tribes—relationships that took years to rebuild and that benefit all
> Oklahomans.

*Id.*

Attorney General Drummond explained that the Nation and its sister Tribes had enacted
wildlife laws and regulations after conferring with ODWC officials "to avoid conflict with
Oklahoma's wildlife conservation efforts," and that they had crafted their laws to ensure "respect
for private property rights, … compliance with cumulative harvest limits, adherence to federal
laws and rules, and observance of hunter safety protocols." Dkt. 1-2 at 3–4. As a result, "it is
difficult to comprehend what wildlife conservation or other governmental interest Oklahoma
could claim that the Tribal nations have not already accommodated, if not specifically protected,
let alone an interest that would justify Oklahoma's assertion of a law enforcement authority that
denie[s] the integrity of the tribal system." *Id.* at 4.

When Defendant Free declined to abandon the ODWC's directive and the pending
citations, Attorney General Drummond announced that "any further cases filed against members
of Native American tribes for hunting on tribal land without a [state-issued] license will be taken

8

over by the Attorney General's Office and promptly dismissed."[5] After the Attorney General then dismissed several pending prosecutions, Governor Stitt responded by appointing Defendant Cochran as special prosecutor with orders to refile those cases and to continue with the enforcement and prosecution of tribal citizens under state fish and game laws within Indian country. Defendant Cochran has followed the Governor's orders.[6]

Within the Creek Reservation and pursuant to the ODWC's unlawful policies, ODWC game officials have coerced Nation citizens into compliance with ODWC licensing and harvest reporting requirements. They have threatened citation and prosecution should those citizens exercise their treaty-protected rights to hunt and fish within the Creek Reservation in compliance with Nation law without purchasing a state license and thereafter reporting their harvest to the ODWC. *See* Kissee Decl. ¶ 46; Pettigrew Decl. ¶¶ 14–15; Downum Decl. ¶ 12. As a direct result of their threats, and out of fear of the consequences of state citation and prosecution (including for their professional licenses and employment), Nation citizens have opted to conduct their hunting activities pursuant to the state's licensing and reporting regime rather than the Nation's. *See* Pettigrew Decl. ¶¶ 16–19; Downum Decl. ¶ 13.

On December 18, 2025, Attorney General Drummond issued a formal opinion stating that under United States Supreme Court precedent, the State lacks "authority to regulate hunting and fishing by Indians on their own reservations," such that the ODWC lacks "authority to enforce the [ODWC] Wildlife Code on a [tribal citizen] who seeks to harvest game on the land the

---

[5] Press Release, Okla. Att'y Gen., *Drummond To Dismiss Native American Hunting Case* (Oct. 30, 2025), https://oklahoma.gov/oag/news/newsroom/2025/october/drummond-to-dismiss-native-american-hunting-case.html.

[6] Derrick James, *Stitt Reloads in Jurisdiction Fight, Appoints Special Prosecutor for Tribal Hunting Cases*, NonDoc (Nov. 15, 2025), https://nondoc.com/2025/11/15/stitt-reloads-in-jurisdiction-fight-appoints-special-prosecutor-for-tribal-hunting-cases/.

federal government promised to his or her tribe." Dkt. 1-4 at 3. He emphasized that a formal opinion of the Attorney General is "binding upon state officials affected by them, and they must follow … those opinions." *Id*. at 10 n.21 (citing Okla. Stat. tit. 74, § 18b; *Oklahoma ex rel. York v. Turpen*, 681 P.2d 763, 765 (Okla. 1984); *see also Oklahoma ex rel. Fent v. Oklahoma ex rel. Okla. Water Res. Bd.*, 66 P.3d 432, 441 (Okla. 2003) ("Public officers have the duty to follow Attorney General opinions until they are judicially relieved of compliance.").

Because Defendants have provided no indication that they will honor the Attorney General opinion and bring their actions into compliance with federal or state law, the Nation brings this motion to enjoin Defendants' actions and to vindicate its sovereign authority over hunting and fishing on the Creek Reservation.[7] If, in the coming weeks, Defendants demonstrate unequivocally that they will cease their threats, citations, and/or prosecutions of tribal citizens as set forth in the Nation's Complaint, the Nation will voluntarily dismiss this action as moot.

## ARGUMENT

To obtain a preliminary injunction, the Nation must establish "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). Each of these factors weighs strongly in favor of a preliminary injunction.

---

[7] The Nation's Complaint states separate claims challenging Defendants' assertions of jurisdiction over Nation citizens (Count 1) and over the citizens of neighboring tribes hunting and fishing within the Creek Reservation pursuant to the Five Tribe Wildlife Management Reciprocity Agreement (Count 2). This motion seeks preliminary injunctive relief solely with respect to Count 1.

I.      **The Nation Has a Substantial Likelihood of Prevailing on the Merits.**

A.      **The Nation Has Sovereign Authority To Regulate Hunting and Fishing by Its Citizens within Its Reservation Free from State Interference.**

"[T]he right to hunt and fish on reservation land is a long-established tribal right[.]" *United States v. Fox*, 573 F.3d 1050, 1054 (10th Cir. 2009) (quoting *Felter*, 752 F.2d at 1509). That right "need not be expressly mentioned [by] treaty," *United States v. Dion*, 476 U.S. 734, 738 (1986); *Fox*, 573 F.3d at 1053 (quoting same); *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1202 (10th Cir. 2002) (quoting same), and endures "unless such rights were clearly relinquished by treaty or have been modified by Congress," *Dion*, 476 U.S. at 738. Because "[i]ndividual Indians ... enjoy a right of user in the tribe's hunting and fishing rights," *Fox*, 573 F.3d at 1054 (brackets and ellipsis in original) (citation omitted), a tribe "possesses the discretion inherent in the police power to regulate" the use of "fish and game resources" by its citizens within its reservation "as it sees fit," *Felter*, 752 F.2d at 1511. The authority to do so constitutes a key "aspect of tribal sovereignty," and tribal hunting and fishing regulations exist under "the protection of" and carry "the force of federal law," *Mescalero*, 462 U.S. at 337–38.

Because the Creek Reservation has survived to this day as Indian country, *see McGirt*, 591 U.S. at 902–13, Defendants are prohibited from exercising the jurisdiction they assert. It is well-settled that where "the land remains in Indian Country status," tribal citizens "are not subject to state regulation" of hunting and fishing absent Congress's blessing. *Felter*, 752 F.2d at 1510; *see also, e.g.*, *Mescalero*, 462 U.S. at 330 (stating that within their Indian country, tribes "exercise[] exclusive jurisdiction [vis-à-vis states] over hunting and fishing by members of the Tribe"). Congress has repeatedly recognized this principle in underscoring the immunity of tribes and tribal members from state hunting and fishing regulation. Hence, even when it has granted jurisdiction over Indians in Indian country to states by statute—which it has not done with

Oklahoma, *see McGirt*, 591 U.S. at 929; *Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 980 & n.6 (10th Cir. 1987)—Congress has expressly carved out fishing and hunting, preserving tribal immunity from state regulation. *See, e.g.*, 18 U.S.C. § 1162(b); 25 U.S.C. §§ 232, 233, 1321(b); *Mescalero*, 462 U.S. at 340 n.25 (discussing these provisions as evidencing Congress's understanding that "State regulation of hunting and fishing on reservations" is preempted absent congressional assent).

The Tenth Circuit has vindicated these principles in a directly analogous case. In *Cheyenne-Arapaho Tribes*, the tribes sought to enjoin Oklahoma's assertion of "jurisdiction over Indian hunting and fishing," 618 F.2d at 666, on lands the Circuit concluded "are Indian Country within the meaning of s 1151(a)," *id*. at 668. The Circuit explained that "[s]tates have no authority over Indians in Indian Country unless it is expressly conferred by Congress," *id*.; *see also, e.g.*, *Hackford v. Utah*, 845 F.3d 1325, 1327 (10th Cir. 2017) (quoting same). Absent such assent, federal law "forbid[s] states the right to control Indian hunting and fishing," *Cheyenne-Arapaho Tribes*, 618 F.2d at 669 (citation omitted). Because, far from providing such assent, "Congress has consistently protected the hunting and fishing rights of Indians," *id*. at 668, the Circuit held that "state hunting and fishing laws do not apply, directly or indirectly, to hunting and fishing by members of the Cheyenne-Arapahoe Tribes" on lands the court deemed Indian country, *id*. at 669; *accord Mescalero*, 462 U.S. at 325, 332.

These controlling principles govern here as well. Defendants seek to assert jurisdiction over hunting and fishing by Creek citizens within the Creek Reservation but cannot claim that Congress has sanctioned their exercise of authority. That should be the end of the matter.

Moreover, as a corollary to the ODWC's lack of civil jurisdiction to regulate hunting and fishing by Nation citizens within the Creek Reservation, it lacks criminal jurisdiction to

prosecute Nation citizens for alleged non-compliance with those requirements. "[A] clear expression of the intention of Congress" is required before states "may try Indians for conduct on their lands." *McGirt*, 591 U.S. at 929 (citation omitted). The Tenth Circuit has adhered to this rule with crystal clarity. In *Ute Indian Tribe*, where a state sought to prosecute a tribal member for violation of the state's traffic code, the Circuit admonished that "unless Congress provides an exception to the rule—and it hasn't here—states possess 'no authority' to prosecute Indians for offenses in Indian country." 790 F.3d at 1004 (quoting *Cheyenne-Arapaho Tribes*, 618 F.2d at 668); *see also Hackford*, 845 F.3d at 1327 (same); *United States v. Sands*, 968 F.2d 1058, 1061–63 (10th Cir. 1992) (same); *Ross v. Neff*, 905 F.2d 1349, 1352–53 (10th Cir. 1990) (same).

The Supreme Court has confirmed that "Oklahoma cannot come close" to establishing that Congress has assented to Oklahoma's criminal jurisdiction over Indians within the Creek Reservation. *McGirt*, 591 U.S. at 929. Accordingly, "the State has no right to prosecute Indians for crimes committed" there. *Id*. at 899. "Responsibility to try these matters … fall[s] instead to the federal government and Tribe." *Id*.

The Nation accordingly has a substantial likelihood of establishing that the ODWC lacks both civil and criminal jurisdiction to implement its new policy directive. Attorney General Drummond, "the chief law officer of the state," Okla. Stat. tit. 74, § 18b(A), agrees. *See* Dkt. 1-4 at 3 (stating that no Supreme Court precedent supports the proposition "that the state has authority to regulate hunting and fishing by Indians on their own reservations" and that "it is clear that the state does not have authority to enforce the [ODWC] Wildlife Code on a [tribal citizen] who seeks to harvest game on the land the federal government promised to his or her tribe"); Dkt. 1-3 at PDF p. 2 ("ODWC's policy directly contradicts well-established federal law

recognizing tribal sovereignty over hunting and fishing by tribal members on reservation lands."
(citing *Cheyenne-Arapaho Tribes*, 618 F.2d at 669, and *Felter*, 752 F.2d at 1510)).

### B.    No Exceptional Circumstances Warrant State Regulation of Creek Citizens on the Creek Reservation.

The Supreme Court has recognized a narrow exception to the principles outlined above in holding that states may assert civil jurisdiction over on-reservation hunting and fishing by tribal members under "exceptional circumstances," *Mescalero*, 462 U.S. at 331–32 & n.15 (citing *Puyallup Tribe, Inc. v. Dep't of Game of Wash.*, 433 U.S. 165, 175 (1977)). The Court addressed the limited scope of such circumstances in *Puyallup Tribe*. There, Washington State alleged that tribal members "were fishing extensively in the Puyallup River … in a manner which would *virtually exterminate* the [steelhead] fishery if not enjoined." 433 U.S. at 168 (emphasis added). The Court held that because the fishery was a shared resource, tribal fishers did not enjoy "untrammeled on-reservation fishing rights" such that they "could interdict completely the migrating fish run" and leave none to be caught by non-tribal fishers, *id*. at 176. Accordingly, the Court upheld the state court's equitable apportionment of the steelhead fishery between tribal and non-tribal fishers. "The police power of the State," it reasoned, "is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets." *Id*. (quoting *Dep't of Game of Wash. v. Puyallup Tribe*, 414 U.S. 44, 49 (1973)).

No such circumstances exist here. The Nation claims no exclusive or "untrammeled" right to the fish and game within the Creek Reservation. Nor can the ODWC reasonably claim that Nation citizens are taking an inordinate share, or otherwise imperiling populations, of fish and game. To the contrary, the Nation controls the hunting and fishing of its citizens under regulations that substantively match those of the ODWC. Thus, Nation citizens hunt and fish

within the Reservation pursuant to restrictions at least as stringent as those that apply to non-Indian hunters and fishers. *See supra* p. 6. As Attorney General Drummond has explained with respect to neighboring tribes that have, like the Nation, enacted comprehensive fish and game regulations tracking those of the ODWC, "no state regulatory function or service justifies concurrent jurisdiction over Indians already subject to comprehensive tribal regulation. The Nations' comprehensive wildlife codes already address the same conservation objectives the State pursues, leaving no gap for state regulation to fill." Dkt. 1-4 at 8. Thus, "it is difficult to comprehend what wildlife conservation or other governmental interest Oklahoma could claim that the Tribal nations have not already accommodated[.]" Dkt. 1-2 at 4.

### C.    The ODWC's Asserted Legal Justification for Its New Policy Is Erroneous.

In its October 9, 2025 directive, the ODWC seeks to justify its assertion of jurisdiction over tribal citizens by relying on the Oklahoma Supreme Court's decision in *Stroble v. Okla. Tax Comm'n*, No. 120,806, 2025 WL 1805918 (Okla. July 1, 2025) (per curium), *petition for cert. filed* (U.S. Oct. 1, 2025) (No. 25-382). Press Release, *supra* n.4. In *Stroble*, that court held that *McGirt*'s holding that the Creek Reservation is Indian country under 18 U.S.C. § 1151 ("§ 1151") pertains only "to the narrow issue of criminal jurisdiction under the Major Crimes Act," 2025 WL 1805918, at *4, such that the categorical federal law prohibition against state taxation of Indians within their own Indian country does not apply within the Creek Reservation. The ODWC would extend the holding to state regulation as well.[8]

But the argument that the Creek Reservation is a reservation for Major Crimes Act (MCA) purposes only is baseless. As a threshold matter, this Court of course owes no deference

---

[8] The Major Crimes Act, 18 U.S.C. § 1153, provides for federal jurisdiction over Indians in Indian country for a list of fourteen major criminal offenses.

to the Oklahoma Supreme Court's reading of *McGirt*. *See Dutcher v. Matheson*, 840 F.3d 1183, 1195 (10th Cir. 2016) ("[I]t is beyond cavil that we are not bound by a state court interpretation of federal law." (citation omitted)); *Wilder v. Turner*, 490 F.3d 810, 814 (10th Cir. 2007) (same); *Muscogee (Creek) Nation v. City of Henryetta*, 25-CV-227-JAR, 2025 WL 3215729, at *3 (E.D. Okla. Nov. 18, 2025) ("State courts do not speak the final word on questions of federal law, and this Court owes no deference, neither doctrinal nor diplomatic, to an opinion that contradicts controlling precedent."). This rule applies with even greater force here, where the ink has not yet dried on *Stroble*, and the Supreme Court will soon take up a pending petition for certiorari.[9]

Nor is *Stroble*'s attempt to cabin *McGirt*'s recognition of the Creek Reservation to the MCA remotely persuasive. In *McGirt*, the Supreme Court first addressed whether the treaties entered into by the United States and the Nation set aside a reservation that would qualify as Indian country under § 1151. The Court engaged in a detailed historical and legal analysis before finding it "obvious" that "Congress established a reservation for the Creeks," with "boundary lines which will secure a country and permanent home to the whole Creek Nation of Indians" within which, "with exceptions, the Creeks were to be 'secured in the unrestricted right of self-government,' with 'full jurisdiction' over enrolled Tribe members and their property," *McGirt*, 591 U.S. at 899–900, 902 (quoting and citing Treaty with the Creeks art. XIV, Mar. 24, 1832, 7 Stat. 366, 368; Treaty with the Creeks preamble, Feb. 14, 1833, 7 Stat. 417, 418; Treaty with Creeks and Seminoles art. XV, Aug. 7, 1856, 11 Stat. 699, 704). Nothing about that analysis turns on the MCA, which postdated the establishment of the Creek Reservation by half a century.

---

[9] *See* Supreme Court docket, https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/25-382.html (setting conference date for January 9, 2026).

The Court then engaged in a similarly extensive analysis as to whether Congress has ever disestablished the Creek Reservation, *id.* at 903–24, concluding that "in all this history there simply arrived no moment when any Act of Congress dissolved the Creek Tribe or disestablished its reservation," *id*. at 913. Once again, nothing about that conclusion turns on the MCA, and the extent to which the ODWC and the Oklahoma Supreme Court distort *McGirt* in nevertheless characterizing it as a decision limited to the MCA is striking. The MCA is not a source of tribal authority. Rather, it is a "carefully limited intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land[.]" *United States v. Wheeler*, 435 U.S. 313, 325 n.22 (1978) (citation omitted). By contrast, the treaties and statutes that underpin *McGirt*'s analysis *did* confer tribal powers, and it was based on those provisions that the Court found it beyond question that Congress had established and preserved a reservation for the Nation. *See supra* p. 16. The Oklahoma Supreme Court and the ODWC ignore all this in illogically decreeing that *McGirt* recognizes a Creek Reservation only for purposes of a statute that diminishes rather than confers tribal authority.

To justify its holding, the *Stroble* court seized on *McGirt*'s statement that "[t]he only question before us … concerns the statutory definition of 'Indian country' as it applies in federal criminal law under the [MCA]," *Stroble*, 2025 WL 1805918, at *4 (quoting *McGirt*, 591 U.S. at 935). But § 1151 *is* "the statutory definition of 'Indian country' as it applies in federal criminal law under the MCA," 591 U.S. at 935, and the *McGirt* Court noted that there are many contexts beyond the MCA in which § 1151 provides the controlling definition of Indian country, *see id*. ("Of course, many federal civil laws and regulations do currently borrow from § 1151 when defining the scope of Indian country."); *see also Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 (1998) (stating that while § 1151's Indian country "definition by its terms

relates only to federal criminal jurisdiction, we have recognized that it also generally applies to questions of civil jurisdiction"). The *McGirt* dissenters agreed that, beyond the MCA, many "federal laws, triggering a variety of rules, spring into effect when land is declared a reservation," 591 U.S. at 971 (Roberts, C.J., dissenting).

Accordingly, every member of the *McGirt* Court recognized that the Court's determination that the Creek Reservation is Indian country under § 1151 would control in contexts where § 1151 provides the relevant definition of Indian country. This case is unquestionably such a context. As the Tenth Circuit held in *Cheyenne-Arapaho Tribes*, where the lands at issue "are Indian Country within the meaning of s 1151(a)," 618 F.2d at 668, state laws "do not apply, directly or indirectly, to hunting and fishing by [tribal] members" unless authorized by Congress, *id.* at 669. Congress has provided no such authorization here.

Nor can the Oklahoma Supreme Court's extreme truncation of *McGirt* be reconciled with the Supreme Court's subsequent decision in *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022). That case did not involve a crime covered by the MCA, but the Court (in an opinion joined by every member of the *McGirt* dissent) stated without qualification that "[i]n light of *McGirt* and the follow-on cases [concerning other reservations], the eastern part of Oklahoma, including Tulsa, is now recognized as Indian country," *id*. at 634. Accordingly, it had no difficulty in that non-MCA context in treating "[t]he jurisdictional dispute in this case [as] aris[ing] … [in] Indian country" as that term is defined in "18 U.S.C. § 1151," *id* at 636.

The ODWC and the Oklahoma Supreme Court simply refuse to acknowledge what is clear to the United States Supreme Court: the Creek Reservation is Indian country, such that the jurisdictional rules and immunities that generally apply in Indian country apply within the Reservation. The Nation accordingly has a substantial likelihood of prevailing on the merits.

II.     **Defendants' Actions Irreparably Harm the Nation and Its Citizens.**

The Tenth Circuit has "repeatedly stated" that the enforcement of state law against

Indians within Indian country is "an invasion of tribal sovereignty [that] can constitute

irreparable injury." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006). In

*Wyandotte*, where "the State Defendants … [were] enforcing state [gaming] law on Indian land,"

*id.*, the Court found that the Tribe would suffer "devastating losses" to its "sovereignty and well-

being" absent an injunction, *id.* at 1256 (citation omitted).

Here, Defendants' actions are textbook interference with tribal sovereignty of the very

sort the Tenth Circuit has concluded is irreparable harm. In *Prairie Band of Potawatomi Indians

v. Pierce*, 253 F.3d 1234 (10th Cir. 2001), the tribe had engaged in "a traditional governmental

function" by enacting its own vehicle registration and titling provisions and applying them to

tribal members owning vehicles and residing on its reservation. *Id*. at 1250. Kansas refused to

recognize the validity of the tribal regulation and instead commenced citing tribal members for

not complying with state registration and titling requirements. The Circuit held that "the threat of

continued citation by the state created the prospect of significant interference with [tribal] self-

government," *id.* (brackets in original) (quotation marks omitted), because the state's licensing

requirements threatened to supplant the tribe's own requirements, rendering them meaningless,

*id*. at 1252 ("[W]ithout the preliminary injunction, the tribe's registration and titling would likely

have come to an end."). Under these circumstances, the injury to the tribe was "certain and great

and more than merely serious or substantial." *Id*. at 1250 (quotation marks omitted).

The same is true here. Exercising its "inherent sovereign authority," *Ysleta Del Sur

Pueblo v. Texas*, 596 U.S. 685, 689 (2022) (citation omitted), the Nation has enacted laws and

regulations governing on-Reservation hunting and fishing by its citizens. Defendants' efforts,

unless enjoined, would nullify the legal infrastructure the Nation has established and its sovereign determination that when its citizens hunt and fish within the Reservation in compliance with the Nation's laws, those activities are *lawful*. *See* Wisner Decl. ¶¶ 22–23. Nation citizens will instead be coerced into compliance with the ODWC's requirements out of fear of punishment by Defendants and their subordinates. That is indeed already taking place. *See* Pettigrew Decl. ¶¶ 14, 18 (stating that, after being told of the ODWC's new policy, "I feared that if we did not register the deer with the State, my son and I would get into trouble," and "moving forward, [my family] will make sure we are licensed by the State and that we check in any deer we harvest with the State *instead of the Nation* unless a court or other official source tells us otherwise. I cannot afford to lose my professional nursing license if I am cited or accused of a state crime" (emphasis added)); Downum Decl. ¶ 13 (stating that after being threatened with citation by ODWC game warden, "I checked the deer in with the State *instead of the Nation* in order to avoid a citation. I felt ashamed as a Creek citizen that I did not check the deer in with the Nation, but I thought that I did not have a choice and that reporting to the State was the safer thing to do to avoid adverse legal consequences from the State." (emphasis added)).

Absent a preliminary injunction, the result will thus be the displacement of the Nation's laws and regulations by those of the ODWC, such that the independent force of the Nation's laws will "come to an end," *Prairie Band*, 253 F.3d at 1252. This would irreparably infringe on "the right of reservation Indians to make their own laws and be ruled by them," *Mescalero*, 462 U.S. at 332 (citation omitted). The chief law enforcement officers of the State and the Nation agree. *See* Dkt. 1-4 at 9 (noting that state jurisdiction over Indian hunting and fishing in Indian country "would 'effectively nullify [tribes'] unquestioned authority to regulate the use of their resources by [Indians], interfere with the comprehensive tribal regulatory scheme, and undermine

Congress's firm commitment to the encouragement of tribal self-sufficiency and economic development.' *Mescalero*, 462 U.S. at 343–44"); Wisner Decl. ¶ 22 ("When the ODWC nevertheless declares [hunting and fishing by Nation citizens in compliance with Nation law] to be illegal and subjects Nation citizens to state citation and prosecution, that in very real effect negates the force of the Nation's own laws" and "erodes the citizenry's … respect for the Nation's laws and regulations and their confidence in the Nation's sovereign authority.").

These harms would only be compounded by subjecting Nation citizens to the jurisdiction of state courts for non-compliance with the ODWC's fish and game licensure requirements. "It is axiomatic that absent clear congressional authorization, state courts lack jurisdiction to hear cases against Native Americans arising from conduct in Indian country." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1204 (10th Cir. 2018). If a Nation citizen violates fish and game laws within the Reservation, that is a matter for the Nation and its courts. *See* Wisner Decl. ¶¶ 10–11. Defendants would again displace that core aspect of tribal self-government. *See, e.g.*, *Fisher v. Dist. Ct. of Sixteenth Jud. Dist.*, 424 U.S. 382, 387–88 (1976) (stating that "[s]tate-court jurisdiction plainly would interfere with the powers of self-government conferred upon the … Tribe and exercised through the Tribal Court" by subjecting reservation Indians "to a forum other than the one they have established for themselves").

In *Ute Indian Tribe*, the Tenth Circuit found that a tribe suffered irreparable harm when Utah and its political subdivisions subjected tribal members to criminal prosecution in state courts for traffic offenses within the tribe's Indian country. Because Congress had not assented, the state had "no legal entitlement" to undertake those prosecutions, 790 F.3d at 1007, and doing so was "itself an infringement on tribal sovereignty," *id.* at 1005. That infringement was made worse by the state's "disregard of [the Circuit's] decisions" foreclosing such prosecutions, *id.*

These circumstances rendered "the harm to tribal sovereignty … perhaps as serious as any to come [the court's] way in a long time." *Id.*

The situation here is again directly analogous. By threatening Nation citizens with criminal prosecution for hunting and fishing within the Creek Reservation without a state license, and interfering with the Nation's own regulation of those same citizens, Defendants disregard not only *McGirt*, *see* 591 U.S. at 898 (stating that absent congressional assent, "[s]tate courts generally have no jurisdiction to try Indians for conduct committed in Indian country" (quotation marks omitted)), but also controlling Circuit decisions including *Prairie Band*, *Ute Indian Tribe*, *Cheyenne-Arapaho*, and *Felter* that foreclose Defendants' efforts to regulate and prosecute Creek citizens for activities taking place on the Creek Reservation. Thus, as in *Ute Indian Tribe*, "there's just no room to debate" that the ODWC's actions represent the very type of "significant interference with [tribal] self-government that this court has found sufficient to constitute irreparable injury," 790 F.3d at 1006 (brackets in original) (quotations marks and citation omitted).

Finally, supplanting the Nation's Conservation Code and Conservation Regulations with the ODWC's regulations harms more than the sovereignty of the Nation; it directly harms Nation citizens who forged the Nation as the instrument of their own self-government. *See* MCN Const. Preamble ("We the People … to preserve our basic Rights and Heritage, to strengthen and preserve self and local Government, … do ordain and establish this Constitution for the Muscogee (Creek) Nation.").[10] When the Nation manages thousands of acres of Nation lands for hunting and fishing by Nation citizens, *see* Kissee Decl. ¶ 18; when it sponsors hunts for the benefit of elders and other citizens in need, *id.* ¶ 19; when it undertakes comprehensive

---

[10] https://creeksupremecourt.com/constitution.

conservation programs, *id*. ¶¶ 11–16; and when it imposes its own hunting and fishing regulations on Nation citizens, Wisner Decl. ¶ 5; Kissee Decl. ¶ 9—it does so as an extension of the Nation's citizenry. Each of those citizens, by partaking in those programs and consenting to the Nation's governance and laws, and hunting and fishing in compliance with those laws to feed their families and deepen their ties to their Creek heritage, is engaged in an act of self-governance. *See, e.g.*, Kissee Decl. ¶¶ 20, 23, 47; Pettigrew Decl. ¶ 9; Downum Decl. ¶¶ 3, 5. As the Tenth Circuit has recently underscored, Indian self-government is not merely a tribal right. "[I]ndividual Indians living on reservations have the right to make their own laws and be ruled by them," and each has the "right as an Indian living on a reservation to be self-governing." *Hooper v. City of Tulsa*, 71 F.4th 1270, 1278 (10th Cir. 2023) (quotation marks omitted). When the ODWC imposes state fish and game laws on Nation citizens under threat of state prosecution for non-compliance, it tramples those rights and impermissibly subjects tribal citizens to a government "other than the one they have established for themselves." *Fisher*, 424 U.S. at 387–88.

### III.     The Balance of Harms and Public Interest Strongly Favor Injunctive Relief.

The ODWC can identify no cognizable harm that would follow from a preliminary injunction. The agency, under the direction of Defendant Free, asserts only that "[e]very license dollar funds the conservation programs that benefit hunters, anglers, and wildlife alike, so it is critical that every user contributes to this funding model that has made Oklahoma a top ten hunting and fishing destination." Press Release, *supra* n.4. As in *Prairie Band*, then, the ODWC's asserted harm is "one of revenue," 253 F.3d at 1252 (citation omitted). But revenue considerations, the Tenth Circuit has held, are insufficient because "[f]ederal Indian law is replete with examples in which state law has had to accommodate tribal sovereignty" and "the

state has not been prevented from enforcing its registration and titling laws wholesale—only with respect to the tribe and its members. In contrast, without the preliminary injunction, the tribe's registration and titling would likely have come to an end." *Id.*

That reasoning squarely governs here. The ODWC's hunting and fishing licensing requirements apply throughout Oklahoma, and the preliminary injunction requested by the Nation would prevent their application "only with respect to the tribe and its members" while engaged in activity within the Creek Reservation, *id.* And because the Nation citizens hunt and fish under Nation fish and game regulations that mirror those of the ODWC, the ODWC can point to no impairment of its conservation, public safety, or other interests that would result from an injunction. As Attorney General Drummond has emphasized, "no state regulatory function or service justifies concurrent jurisdiction over Indians already subject to comprehensive tribal regulation[s] … [that] address the same conservation objectives the State pursues, leaving no gap for state regulation to fill." Dkt. 1-4 at 8.

By contrast, absent a preliminary injunction, the Nation's entire body of hunting and fishing regulations would be nullified and effectively "come to an end" because licensed Nation citizens fully complying with those regulations would still be subject to state prosecution. As noted above, *supra* pp. 22–23, this not only harms the Nation's sovereignty and rights of self-government, but the self-governance rights of its citizens as well.

Nor would the public interest be disserved by a preliminary injunction. In *Prairie Band*, the defendants asserted that state licensing and registration requirements serve the public's interest in roadway safety. But the Circuit agreed with the tribe that "the public has an interest in encouraging tribal self-government and that the tribal motor vehicle laws benefitted the public by providing a safe and efficient transportation system and by establishing standards for the

24

registration of vehicles and the issuance of certificates of title." 253 F.3d at 1252 (brackets and quotation marks omitted). Thus, because the tribe's own regulations addressed the very concerns invoked by the State, the latter's asserted public safety interests were "not as portentous as the defendants" claimed, and the Circuit had little difficulty concluding that "the public interest would not be adversely impacted by the issuance of the preliminary injunction," *id*. at 1253.

The same is again true here. As the declarations submitted by the Nation evidence, the ability of Nation citizens to hunt and fish to sustain their families and maintain and deepen their cultural connections under their own treaty rights and promulgated laws is profoundly important. *See* Kissee Decl. ¶¶ 17–25; Pettigrew Decl. ¶¶ 9, 11–12; Downum Decl. ¶¶ 5, 7–8. The Nation's regulation of those fundamental activities constitutes a core expression of tribal self-government, which "the public has an interest in encouraging," *Prairie Band*, 253 F.3d at 1252. And those regulations "benefit[] the public," *id.*, by subjecting Nation citizens to effective hunting and fishing restrictions that serve conservation and public safety interests on terms identical to (or more restrictive than) those applied to non-Indians by the ODWC throughout Oklahoma. *See supra* p. 6. Accordingly, a preliminary injunction would preserve those benefits without *any* corresponding impairment of the public interests served by the ODWC's regulations. "[I]t is difficult to comprehend what wildlife conservation or other governmental interest Oklahoma could claim that the Tribal nations have not already accommodated," Dkt. 1-2 at 4.

## CONCLUSION

The Nation requests that the Court issue the preliminary injunction.

Dated: January 5, 2026

Geraldine Wisner
Deputy Attorney General
MUSCOGEE (CREEK) NATION
P.O. Box 580
Okmulgee, OK 74447

O. Joseph Williams
O. JOSEPH WILLIAMS LAW OFFICE, PLLC
The McCulloch Building
114 N. Grand Avenue, Suite 520
P.O. Box 1131
Okmulgee, OK 74447

Respectfully submitted,

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
David A. Giampetroni
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Avenue, Suite 220
Tulsa, OK 74103

*Counsel for Muscogee (Creek) Nation*

**CERTIFICATE OF SERVICE**

I certify that on January 5, 2026, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji
